DUSKIN v DEPARTMENT OF HUMAN SERVICES

Docket No. 279151. Submitted December 3, 2008, at Detroit. Decided
    June 11, 2009, at 9:05 a.m.

    Rodney Duskin and 15 other racial and ethnic minority males
    employed by the Department of Human Services (DHS) brought a
    disparate treatment, employment discrimination action against
    the DHS in the Ingham Circuit Court, alleging discrimination
    based on race, ethnicity, and gender with respect to promotions to
    supervisory and managerial positions. The court, Beverley
    Nettles-Nickerson, J., granted the plaintiffs' motion for certifica-
    tion of a class of plaintiffs comprised of all minority male employ-
    ees of the DHS, including 616 African-American, Hispanic, Arab,
    and Asian males in various departments and offices throughout
    the state. The plaintiffs sought a permanent injunction to stop
    discrimination against minority male employees, an order requir-
    ing the DHS to promote minority male employees to positions that
    were denied to them, and an award of monetary compensation for
    opportunities for promotions that were withheld from the class
    members. The Court of Appeals, Owens, P.J., and O'Connell and
    Schuette, JJ., granted the defendant's application for leave to
    appeal the order granting class certification in an unpublished
    order entered March 3, 2008 (Docket No. 279151).

    The Court of Appeals held:

    The trial court erred by concluding that the plaintiffs satisfied
the requirements for class certification stated in MCR 3.501. The
order granting class certification must be reversed.

    1. The plaintiff failed to identify a policy or practice of the DHS
that affects the job opportunities of only ethnic and minority
males.

    2. The plaintiffs failed to satisfy the numerosity requirement
of MCR 3.501(A)(1)(a). The plaintiffs submitted inadequate infor-
mation for the trial court to perform the rigorous analysis neces-
sary to reasonably estimate the true number of African-American,
Hispanic, Arab, and Asian male employees who might have suf-
fered a compensable injury. Absent factual assertions about the
plaintiffs' specific circumstances related to denial of advancement
opportunities, the plaintiffs were required to demonstrate a pat-

tern and practice of discrimination throughout the department. Alternatively, the plaintiffs could have shown that the class representatives were denied promotional opportunities for which they were qualified under circumstances giving rise to an inference of discrimination, and then establish a factual and legal nexus between their claims and those of the proposed class. The plaintiffs failed to make such a showing.

3. The plaintiffs failed to satisfy the commonality requirement of MCR 3.501(A)(1)(b) because the predominant factual and legal inquiries involved are too individualized for class treatment.

4. The plaintiffs failed to satisfy the typicality requirement of MCR 3.501(A)(1)(c). The plaintiffs did not articulate a factual basis to confirm their individual disparate treatment claims and failed to connect their allegations to the other members of the class. Individualized questions clearly predominate over any questions common to the proposed class, and the plaintiffs failed to show that the representative plaintiffs' claims are typical of the class.

5. The record is devoid of information regarding whether the plaintiffs' counsel is qualified to pursue the class action. Therefore, the trial court erred by concluding that the plaintiffs satisfied the requirement of MCR 3.501(A)(1)(d) that the representative parties will fairly and adequately assert and protect the interests of the class. The nature of the plaintiffs' claims make it a virtual certainty that the interests of the individual class members will conflict.

6. The maintenance of this action as a class action fails to meet the superiority requirement of MCR 3.501(A)(1)(e) because in this case individualized inquiries clearly predominate over any common questions.

Reversed.

1. ACTIONS — CLASS ACTIONS — CERTIFICATION OF CLASS — BURDEN OF PROOF.

The burden is on the plaintiff to show that the requirements for class certification exist; the plaintiff must be reasonably specific in demonstrating that the conditions for certification have been met; a class may be certified only if the trial court is satisfied, after a rigorous analysis, that the prerequisites stated in MCR 3.501 have be satisfied.

2. ACTIONS — CLASS ACTIONS — CERTIFICATION OF CLASS — NUMEROSITY REQUIREMENT.

A representative plaintiff in a class action may not simply allege a large number of class members to meet the numerosity requirement for class certification; such plaintiff must have suffered an actual injury and show that the class members also suffered the

injury for which the lawsuit seeks redress; the numerosity require-ment is not met if only a portion of the class would have viable claims (MCR 3.501[A][1][a]).

3. ACTIONS — CLASS ACTIONS — CERTIFICATION OF CLASS — COMMONALITY REQUIREMENT.

A plaintiff seeking class certification must be able to demonstrate that all members of the class had a common injury that could be demonstrated with generalized proof rather than evidence unique to each class member; the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof to meet the commonality requirement for class certification (MCR 3.501[A][1][b]).

4. ACTIONS — CLASS ACTIONS — TYPICALITY OF CLAIMS.

The claims of representative plaintiffs in a class action and unnamed class members are not typical where the defendant may have genuine defenses with regard to the claims of some plaintiffs that are not applicable to unnamed class members.

5. ACTIONS — CLASS ACTIONS — CERTIFICATION OF CLASS — ADEQUACY REQUIRE-MENT.

A two-step inquiry is applicable in determining whether represen-tative parties can fairly and adequately represent the interests of the class as a whole: first, the court must be satisfied that the named plaintiffs' counsel is qualified to sufficiently pursue the putative class action and, second, the members of the advanced class must not have antagonistic or conflicting interests (MCR 3.501[A][1][d]).

*Daryle Salisbury* for the plaintiffs.

*Michael A. Cox*, Attorney General, *B. Eric Restuccia*, Solicitor General, and *Cynthia A. Arcaro* and *Ann M. Sherman*, Assistant Attorneys General, for the defendant.

Before: SAAD, C.J., and FITZGERALD and BECKERING, JJ.

SAAD, C.J. Defendant, the Department of Human Services, appeals the trial court's order granting plain-

tiffs' motion for class certification. For the reasons set forth in this opinion, we reverse.

## I. NATURE OF THE CASE

In this employment discrimination case, plaintiffs sought and received class certification for their claims that Michigan's Department of Human Services (DHS) discriminatorily denies male, but not female, racial and ethnic minorities a sufficient number of promotions to supervisory and management positions. We hold that the trial court clearly erred by certifying this matter as a class action because plaintiffs plainly did not meet their burden of satisfying the rigorous requirements of MCR 3.501, especially the commonality and typicality requirements. The commonality and typicality requirements address the key inquiry in purported class actions—are there common questions of law and fact that are susceptible to generalized proofs, or, do individualized questions and proofs predominate, thus making class treatment inappropriate. And, it is the very nature of plaintiffs' claims that answers this dispositive inquiry. Importantly, plaintiffs fail to identify any policy or practice of the DHS that affects the job opportunities of only ethnic minority males. Instead, plaintiffs make the general allegation that there are insufficient numbers of minority males in management or supervisory positions and they attribute this to what they characterize as a "culture" of discrimination. This contention, of course, is a broad, conclusory allegation that the DHS has a bias against racial and ethnic minority males because there are fewer minority males in higher positions. Yet, a numerical disparity standing alone means nothing, and is simply a number compared to a different number. A statewide organization like the DHS has a great diversity of jobs and job requirements,

and the determination whether there has been discrimination in awarding promotions will be very fact-intensive and highly individualized and, thus, entirely inappropriate for class treatment.

Further, the question of who among many candidates is "best qualified" for a particular job opening is a complex question even when a single promotion is examined. Indeed, for each promotion, during the six years at issue here, the fact-finder must examine the number of applicants, the relevant DHS and pre-DHS work experience and performance reviews of each candidate, the educational requirements and qualifications of the successful and unsuccessful applicants, and the identity of various decision makers in a variety of positions and locations throughout the state. It simply strains credulity to suppose that a jury can render an across-the-board judgment concerning hundreds or thousands of promotional opportunities over many years, in various locations throughout the state, by a variety of decision makers, and involving hundreds or thousands of candidates of varying races, ethnicities, and genders, and each with different experience, education, and performance reviews.

Plaintiffs' case is particularly not conducive to class treatment because it also encompasses claims involving various racial or ethnic groups and both male and female job candidates. Specific allegations would potentially include a claim by a man of Arab descent who was denied a promotion that was given to a woman of Arab descent, or an African-American man who was denied a promotion that was given to a Hispanic woman or to a Caucasian man. Such questions demand individual treatment, particularly where successful candidates are also part of a protected class or share some of the characteristics that plaintiffs claim constituted dis-

criminatory reasons to deny them promotional opportunities. Moreover, it is a virtual certainty that the interests of the individual plaintiffs will conflict because it is likely that more than one plaintiff is seeking appointment to and compensation for the same position that was allegedly wrongfully denied.

Therefore, after reviewing the allegations, the applicable law, and the briefs and arguments of the parties, we hold that plaintiffs' claims are not appropriate for class action litigation and that the trial court clearly erred by so finding.

## II. FACTS AND PROCEDURAL HISTORY

In this disparate treatment, employment discrimination suit, plaintiffs allege discrimination based on race, ethnicity, and gender in promotions to supervisory and management positions. The proposed class is comprised of all "minority" male employees of the DHS, including 616 African-American, Hispanic, Arab, and Asian males in various departments and offices throughout the state.[1] Plaintiffs maintain that, since 2003, fewer minority males have been promoted within the DHS to the positions of program manager, district manager, county director, and first line supervisor because of "department wide cultural deficiencies regarding minority males." According to plaintiffs, these deficiencies include: ineffective communication with minority males; a failure to neutrally and consistently apply promotional policies, criteria, and procedures; a real or perceived preference for the promotion of nonminority male or female candidates; a failure to recruit or ap-

---

[1] Since the filing of this appeal, the parties agree that a small percentage of potential plaintiffs have opted out of the class. However, because our analysis focuses on plaintiffs' 2007 motion for class certification in the trial court, we need not address this issue in this opinion.

point minority males to the DHS leadership academy[2] and supervisory positions; and a failure to hold accountable and train managers about promoting and working with minority males. Plaintiffs assert that some of the plaintiffs applied for and were denied promotions or training opportunities for which they were qualified and some of the plaintiffs were "too discouraged to apply" for promotions "due to [their] frustration with some of [the DHS's] supervisory and management employees' discriminatory attitudes and practices involving racial and gender bias directed against minority males . . . ."

On the basis of the above grounds, plaintiffs allege that the DHS violated the equal protection and antidiscrimination clause of Const 1963, art 1, § 2, and the Civil Rights Act, MCL 37.2101 *et seq*. Plaintiffs asked the trial court to enter a permanent injunction to stop discrimination against minority male employees, to order the DHS to promote minority male employees to positions that were denied them, and to provide monetary compensation for promotional opportunities withheld from class members.

In support of their claims, plaintiffs largely rely on an internal memo authored by DHS Chief Deputy Director Laura Champagne, dated January 5, 2006. The memo provides, in part:

The Office of Equal Opportunity and Diversity Programs (EODP) is currently undertaking a series of case studies. These case studies will look at identifying barriers that specific groups of employees may have in either

---

[2] According to a memo authored by DHS Chief Deputy Director Laura Champagne, the DHS leadership academy trains employees with leadership potential for senior level positions "through a variety of learning opportunities including assessment of personal strengths and areas needing development, developmental planning, mentoring, action learning, developmental assignments and learning forums."

applying for or being successful in being promoted into District Manager, County Director, Section Manager, and first line FIM or Services supervisor positions. The first part of the study will focus on the impact on minority males in the department for the above named positions.

On the basis of data collected from the DHS leadership academy, hiring data, and information gathered through a focus group, the memo cites its "major finding" as follows: "A disparity exists in minority males being promoted into upper management positions, more specifically program manager, district manager, county director and first line supervisory positions throughout the Department." The recommendations to correct the problem include: providing applicants with more information about screening criteria and job requirements; facilitating access to position postings; expanding interview training; requiring department-wide consistency in application submission requirements, screening criteria, and hiring policies; preventing "working out of class" candidates from competing for positions; requiring diversity on interviewing panels; and implementing targeted recruiting for the leadership academy.

Plaintiffs filed their complaint on May 24, 2006, and moved to certify the class on January 8, 2007. The DHS opposed the motion and argued that plaintiffs failed to satisfy the requirements for class certification under MCR 3.501(A)(1). Citing *Neal v James*, 252 Mich App 12; 651 NW2d 181 (2002), and *Zine v Chrysler Corp*, 236 Mich App 261; 600 NW2d 384 (1999), the DHS further asserted that plaintiffs' claims are not appropriate for class treatment. The trial court granted plaintiffs' motion for certification and ruled that plaintiffs' proposed class satisfies the requirements under MCR 3.501(A)(1). With regard to the DHS's case citations, the court simply opined:

> The case at bar, unlike *Neal* or *Zine,* alleges that [the DHS's] studies identified barriers that specific groups of employees may have in either applying for or being considered for promotion into upper level supervisory positions. In *Neal* and *Zine,* there were no such studies performed. The issues in this case deal with broader, state-wide departmental disparate treatment relating to the lack of minority males in upper management positions. Incumbent in that issue is the allegation of bias and employment discrimination based on culture, race, and gender.

Thereafter, the trial court denied the DHS's motion for reconsideration, the DHS filed an application for leave to appeal, and this Court granted the application.

### III. ANALYSIS

#### A. STANDARD OF REVIEW AND APPLICABLE LAW

We review a trial court's ruling on class certification under the "clearly erroneous" standard. *Zine, supra* at 270. "A finding is clearly erroneous when, although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake has been made." *Neal, supra* at 15. As the Court in *Neal* explained at 15:

> Pursuant to [MCR 3.501(A)(1)], one or more members of a specific class may bring suit on behalf of other members of the class only if the following elements are shown to exist:
>
> "(a) the class is so numerous that joinder of all members is impracticable;
>
> "(b) there are questions of law or fact common to the members of the class that predominate over questions affecting only individual members;
>
> "(c) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

"(d) the representative parties will fairly and adequately assert and protect the interests of the class; and

"(e) the maintenance of the action as a class action will be superior to other available methods of adjudication in promoting the convenient administration of justice."

"The burden is on the plaintiff to show that the requirements for class certification exist." *Neal, supra* at 16. With regard to that burden, a plaintiff must provide reasonable specificity in the pleadings to demonstrate that the conditions for certification have been met. *Gen Tel Co of the Southwest v Falcon*, 457 US 147, 161; 102 S Ct 2364; 72 L Ed 2d 740 (1982).[3] As the United States Supreme Court further explained in *Falcon*:

> As we noted in *Coopers & Lybrand* v. *Livesay*, 437 U.S. 463 [98 S Ct 2454; 57 L Ed 2d 351 (1978)], "the class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.' " *Id.*, at 469 (quoting *Mercantile Nat. Bank* v. *Langdeau*, 371 U.S. 555, 558 [83 S Ct 520; 9 L Ed 2d 523 (1963)]. Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question. [*Falcon, supra* at 160.]

Most importantly, a class "may only be certified if the trial court is satisfied, *after a rigorous analysis*, that the prerequisites of [the court rule] have been satisfied." *Id.* at 161 (emphasis added).

---

[3] Though our Court is not bound by federal decisions interpreting Michigan law, *Van Buren Charter Twp v Garter Belt, Inc*, 258 Mich App 594, 604; 673 NW2d 111 (2003), because there is limited caselaw in Michigan addressing class certification, we may refer for guidance to federal cases construing the federal rules on class certification, *Neal, supra* at 15.

B. NUMEROSITY

The first requirement for class certification is that "the class is so numerous that joinder of all members is impracticable[.]" MCR 3.501(A)(1)(a). In *Zine, supra* at 287-288, this Court opined:

> There is no particular minimum number of members necessary to meet the numerosity requirement, and the exact number of members need not be known as long as general knowledge and common sense indicate that the class is large. Because the court cannot determine if joinder of the class members would be impracticable unless it knows the approximate number of members, the plaintiff must adequately define the class so potential members can be identified and must present some evidence of the number of class members or otherwise establish by reasonable estimate the number of class members. [Citations omitted.]

It is not enough for a plaintiff to assert the existence of a large number of class members. To maintain a lawsuit, the plaintiffs must have suffered an actual injury and, therefore, a plaintiff must show that the class members suffered the injury for which the lawsuit seeks redress. *Id.* at 289. In other words, the numerosity requirement is not met if only a portion of the class would have viable claims.

Here, the trial court ruled that plaintiffs met the numerosity requirement because the assertion with regard to the 616-member class is the same, "that [DHS's] promotional departmental deficiencies creat[ed] an upper-level management disparity . . . ."[4] However, the crux of plaintiffs' complaint is that plain-

---

[4] We note that most of the arguments on class certification were conducted off the record by the trial court. The record further indicates that the parties discussed certain evidence and statistical information in chambers. It is not apparent from the record what evidence the trial court relied on in granting plaintiffs' motion for class certification.

tiffs were denied promotions and, as a remedy, plaintiffs ask the trial court to promote minority male employees to positions denied to them because of discrimination and to compensate them for promotional opportunities they lost. *Zine* illustrates how the trial court clearly erred by ruling that the numerosity requirement is satisfied here. In *Zine*, the named plaintiffs alleged that booklets provided to purchasers of Chrysler vehicles contained misleading information about car buyers' remedies if they received a defective vehicle. *Zine, supra* at 265. While the plaintiffs claimed that the class would include more than half a million people who bought Chrysler vehicles, this Court ruled that the plaintiffs failed to satisfy the numerosity requirement. *Id.* at 289. As the Court explained:

> Neither Zine nor the Terrys[5] identified a specific number of class members, but indicated that the class potentially included all 522,658 purchasers of new Chrysler products from February 1, 1990, onward. However, class members must have suffered actual injury to have standing to sue, *Sandlin* [*v Shapiro & Fishman*, 168 FRD 662, 666 (MD Fla, 1996)], so plaintiffs must show that there is a sizable number of new car buyers who had seriously defective vehicles and lost their right to recovery under Michigan's lemon law because they were misled by the documents supplied by Chrysler. Neither Zine nor the Terrys indicated even approximately how many people might come within this group, nor did they indicate a basis for reasonably estimating the size of the group. Therefore, both Zine and the Terrys failed to show that the proposed class is so numerous that joinder of all members is impracticable. [*Zine, supra* at 288-289.]

Here, when plaintiffs moved for class certification, they offered the following argument to show that the purported class fulfills the numerosity prerequisite:

---

[5] T. Leonard Terry and Lois Terry were the representative plaintiffs in *Zine*'s companion case, *Terry v Chrysler Corp.*

> Defendant currently employs 616 minority males. Joining and trying 616 separate lawsuits involving repetition of evidence and testimony would not only constitute an impracticable process for the court system, but an extremely time consuming process for [the DHS's] management employees. Those crucial management employees would have no time to do their work. Class certification would eliminate that burden.

This does not satisfy the numerosity requirement under MCR 3.501(A)(1)(a). While we do not decide the merits of plaintiffs' claims, the crux of a disparate treatment claim based on a failure to promote is that the defendant allegedly discriminated against the plaintiffs in its promotional decisions on the basis of the plaintiffs' race, ethnicity, and gender. Plaintiffs have made no showing of the approximate number of minority male employees of the DHS who applied for managerial positions for which they were qualified. The record also contains no information suggesting that less qualified female or nonminority male candidates received the promotions under circumstances giving rise to an inference of unlawful discrimination. Furthermore, plaintiffs seek relief in the form of appointments to management positions and monetary compensation for promotions and training opportunities they were allegedly denied because less qualified nonminority or female candidates were promoted or accepted into the leadership academy as a result of the DHS's allegedly discriminatory policies. Though plaintiffs were not required to submit evidence with regard to every promotional opportunity each class member should have received and did not, it was incumbent upon plaintiffs to adequately define the class and to provide sufficient information to discern how many people fall within this group. By simply including in the class every African-American, Arab, Hispanic, and Asian male employed by

the DHS and asserting that the class is large, plaintiffs failed to meet their burden of demonstrating that the numerosity requirement has been met.

To at least raise a presumption that each of the proposed class members suffered a compensable injury, plaintiffs could have shown that "racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Int'l Brotherhood of Teamsters v United States*, 431 US 324, 336; 97 S Ct 1843; 52 L Ed 2d 396 (1977). In other words, absent factual assertions about the plaintiffs' specific circumstances related to denial of advancement opportunities, plaintiffs were required to demonstrate a pattern and practice of discrimination throughout the department. *Id*. Alternatively, plaintiffs could have shown that the class representatives were denied promotional opportunities for which they were qualified under circumstances giving rise to an inference of discrimination, and then "establish a factual and legal nexus between their claims and those of the proposed class." *Reyes v Walt Disney World Co*, 176 FRD 654, 658 (MD Fla, 1998), citing *Morrison v Booth*, 763 F2d 1366, 1371 (CA 11, 1985). Plaintiffs made no such showing.

Though plaintiffs submitted some evidence that there is a disparity in the number of minority males in management positions at the DHS, and that a focus group of minority males perceived the disparity to be the result of discrimination against minority males, plaintiffs have made no factual showing that the DHS engages in systemic discrimination against minority males in order to raise a presumption that every minority male employee suffered discrimination through the denial of promotions or training opportunities. In other words, the existence of a disparity is not enough to establish that plaintiffs were the victims of discrimina-

tion. Plaintiffs also made no factual showing that the representative plaintiffs were denied promotional opportunities because of discrimination along with evidence that would " 'bridge the gap' between their claims and those of the putative class." *Reyes, supra* at 658, citing *Falcon, supra* at 157-158.

We find equally unavailing plaintiffs' attempt to expand the number of affected employees by asserting that some class members chose *not* to pursue promotional opportunities because of their *perception* of racism and gender bias. Were we to accept this as a viable legal claim, it nonetheless fails without some showing of a pervasive practice or procedure of discrimination and the estimated number of minority male employees who had promotional opportunities for which they were qualified but decided that, in light of alleged persistent discriminatory practices, pursuing the opportunities would be futile. Simply put, plaintiffs submitted inadequate information for the trial court to perform the "rigorous analysis" necessary to reasonably estimate the true number of African-American, Arab, Hispanic, and Asian male employees who might fit within the parameters of the case. *Falcon, supra* at 161. For these reasons, we hold that the trial court clearly erred when it ruled that plaintiffs satisfied the numerosity requirement.

### C. COMMONALITY AND TYPICALITY

Plaintiffs also failed to establish that the commonality and typicality requirements under MCR 3.501(A)(1)(b) and (c) are satisfied. As this Court explained in *A&M Supply Co v Microsoft Corp*, 252 Mich App 580, 599; 654 NW2d 572 (2002), "MCR 3.501(A)(1)(b) prescribes that, to certify a class action, there must be common questions of law or fact that predominate over individual questions." In *Zine, supra* at 289, this Court further opined:

> The common question factor is concerned with whether there "is a common issue the resolution of which will advance the litigation." *Sprague v General Motors Corp*, 133 F3d 388, 397 (CA 6, 1998), cert den 524 US 923; 118 S Ct 2312; 141 L Ed 2d 170 (1998). It requires that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." *Kerr v West Palm Beach*, 875 F2d 1546, 1557-1558 (CA 11, 1989).

This Court further explained in *Tinman v Blue Cross & Blue Shield of Michigan*, 264 Mich App 546, 563-564; 692 NW2d 58 (2004):

> "It is not every common question that will suffice . . . ; at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality." *Sprague* [*v Gen Motors Corp*, 133 F3d 388, 397 (CA 6, 1998)]. A plaintiff seeking class-action certification must be able to demonstrate that "all members of the class had a common injury that could be demonstrated with generalized proof, rather than evidence unique to each class member . . . . [T]he question is . . . whether 'the common issues [that] determine liability predominate.' " *A&M Supply* [*supra* at 600] (citations omitted).

In other words, for a proper class certification, plaintiffs had to do more than assert that a common question exists. Rather, to meet their burden, plaintiffs had to demonstrate that, with regard to the entire class, common factual and legal questions subject to generalized proofs predominate over individualized questions and individualized proofs.

The typicality requirement often merges with the question of commonality. *Falcon*, *supra* at 157 n 13. A showing of typicality ensures that "the claims or defenses of the representative parties are typical of the claims or defenses of the class[.]" MCR 3.501(A)(1)(c).

" 'While factual differences between the claims do not alone preclude certification, the representative's claim must arise from "the same event or practice or course of conduct that gives rise to the claims of the other class members and . . . [be] based on the same legal theory." ' " *Neal, supra* at 21, quoting *Allen v Chicago*, 828 F Supp 543, 553 (ND Ill, 1993) (citations omitted). "Both [the commonality and typicality requirements] serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon, supra* at 157 n 13. To that end, it is axiomatic that class certification is improper "where the interests of class representatives and class members are antagonistic." *Bobbitt v Academy of Court Reporting, Inc*, 252 FRD 327, 342 (ED Mich, 2008).

In support of their motion for class certification, plaintiffs asserted that, on the basis of the disparity in the number of racial and ethnic minority male supervisors and managers at DHS, common issues predominate because causes for the disparity include ineffective communication, a non-gender-neutral promotion process, inconsistent policy application, inconsistent application and screening criteria, lack of accountability, and failure to target minority males in recruiting efforts. The trial court ruled that plaintiffs met the commonality requirement for the following reasons: "there are common questions of law and/or facts including, but not limited to, [the DHS's] alleged failure to implement gender neutral criteria for promotion, screening criteria, statistical feedback and accountability." We hold that the trial court clearly erred when it found that plaintiffs satisfied the commonality requirement be-

cause the predominant factual and legal inquiries involved are clearly too individualized for class treatment.

Plaintiffs allege that they applied or were available for promotions or acceptance into the leadership academy and that they were denied one or more advancement and training opportunities. Plaintiffs further allege that some or all of the plaintiffs chose not to apply for one or more promotions because they were discouraged by cultural deficiencies at the DHS. Unlike disparate impact claims involving a challenge to a specific employment practice, a claim of disparate treatment "weighs against finding the commonality and typicality . . . ." *Washington v Brown & Williamson Tobacco Corp*, 959 F2d 1566, 1570 n 10 (CA 11, 1992). "Such claims, by their nature, are highly individualized and are, therefore, not generally susceptible to class treatment." *Reyes*, *supra* at 658.

Plaintiffs attempt to couch their alleged injuries as resulting from a general "culture" of discrimination against racial and ethnic minority males but, again, they have shown no policy or practice of discrimination by the DHS that would suggest that common questions predominate over individual ones. While plaintiffs claim that the internal memo suggests that the DHS acknowledges its own discriminatory practices, the document says no such thing. To the contrary, it merely acknowledges a disparity in the number of minority males in management positions, sets forth complaints by volunteers in the focus group, and recommends that managers generally provide more information about open positions, ensure consistency in application and hiring policies, target more employees for the leadership academy, provide interview training, and ensure diversity on interview panels. This does not, in any sense, suggest the presence of a standardized employ-

ment practice or policy of discrimination. *Neal, supra* at 18. Nor does a numeric disparity suggest that any individual discrimination occurred where individual promotional decisions are based on nondiscriminatory reasons such as work experience, education, time on the job, work evaluations, or the superior qualifications of other applicants. Again, these are all based on individual hiring decisions and do not implicate an across-the-board policy.

Indeed, plaintiffs provide no facts with regard to their allegations of gender-biased, ethnically biased, or racist promotional decisions. The memo states that members of the focus group believed that candidates are preselected for positions and they complained about a lack of information and encouragement from managers. They discussed their "perception" that managers hire their friends or relatives of friends and that they have a "perception" that the DHS has a discriminatory culture. But nothing in the memo indicates whether even the complaining focus group members were denied promotions for which they were qualified. Moreover, nothing in the memo suggests that the promotional procedures, even if imperfect, were racially biased, gender-biased, or were applied in a biased manner. Any number of nonminority or female employees might agree, for example, that job postings should be more prominent, that managers should not hire acquaintances, or that the DHS should provide additional interview training and encouragement. And, the alleged "perception" of a bias against minority males simply does not constitute a predominant, common question, particularly because proving such an assertion would require individualized proofs to connect that perception with particular employment decisions. See *Sampleton v Potter*, 271 F Supp 2d 90, 95-96 (D DC, 2003).

If the DHS used "biased testing procedure[s] to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant or employee who might have been prejudiced by the test clearly would satisfy the commonality and typicality requirements . . . ." *Falcon, supra* at 159 n 15. Alternatively, plaintiffs might satisfy the commonality requirement if they presented "[s]ignificant proof that an employer operated under a general policy of discrimination . . . if the discrimination manifested itself in hiring and promotion practices in the same general fashion, such as through entirely subjective decision-making processes." *Id.* At most, the evidence presented by plaintiffs suggests that the DHS has *neutral* promotion policies, and there is no suggestion that promotion procedures are entirely subjective. Again, that plaintiffs perceive that the DHS's practices nonetheless unfairly disqualify minority male candidates from promotions and the leadership academy can only be determined by looking at each promotional decision individually.

While plaintiffs *assert* that the class representatives applied for or were available for promotions, but were not chosen for discriminatory reasons, plaintiffs offer no information about the representatives' eligibility and qualifications, what positions they sought, what qualifications the positions required, and whether a less qualified, nonminority, or female candidate was promoted instead. And, importantly, plaintiffs fail to explain how the claims of the representative plaintiffs present a question common to the entire class of every minority male employee of the DHS. Thus, even if the named plaintiffs offered some basis for their claims, "[c]onceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of

discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims." *Falcon, supra* at 157.

> For respondent to bridge that gap, he must prove much more than the validity of his own claim. Even though evidence that he was passed over for promotion when several less deserving whites were advanced may support the conclusion that respondent was denied the promotion because of his national origin, such evidence would not necessarily justify the additional inferences (1) that this discriminatory treatment is typical of petitioner's promotion practices, (2) that petitioner's promotion practices are motivated by a policy of ethnic discrimination that pervades petitioner's . . . division, or (3) that this policy of ethnic discrimination is reflected in petitioner's other employment practices, such as hiring, in the same way it is manifested in the promotion practices. [*Id.* at 157-158.]

Plaintiffs did not meet the minimum burden to show an agency-wide policy or practice of discrimination or to show that the representative plaintiffs even have viable disparate treatment claims that are also common to the class. As the Court in *Neal* held:

> In reviewing the claims of each of the class representatives in the present case, it is apparent that the only common question presented is whether the individuals involved were discriminated against because of their race. How these individuals may have been discriminated against does not involve common issues of fact or law, but highly individualized questions. The individual factual circumstances pertinent to each plaintiff will need to be reviewed, and individual, fact-specific inquires will need to be made in evaluating why certain individuals were not hired or promoted, or why other individuals were discharged or not retained. Plaintiffs have simply not shown

that there was any specific policy or practice followed by defendants to satisfy the "commonality" requirement under MCR 3.501. [*Neal, supra* at 20.][6]

For the reasons set forth in *Neal*, plaintiffs' claims here are also not appropriate for class treatment.

We further note that the composition of the proposed class itself draws attention to the prospective factual and legal disparities among the individual claims. Plaintiffs' claims include allegations by male job applicants about promotions given to female candidates of the same race or ethnicity or another minority race or ethnicity, and claims by male job applicants about promotions given to Caucasian males, thus raising factual and legal issues relating to allegations of gender discrimination but not racial discrimination or racial discrimination but not gender discrimination, or both. Clearly, the proofs and law necessary to establish that the DHS discriminated against an Hispanic male candidate in favor of an African-American female candidate would differ from those necessary to show that the DHS discriminated against an African-American male candidate in favor of an Arab female candidate. And the proofs and law necessary to establish that the DHS discriminated against an Asian male candidate in favor

---

[6] Here, the record also suggests that individual managers or supervisors made promotional decisions about which plaintiffs complain. On this issue, we agree with the following observation by the Court in *Oda v State*, 111 Wash App 79, 100; 44 P3d 8 (2002):

Where personnel decisions are decentralized, plaintiffs who may be able to prove in an individual lawsuit that they have encountered intentional discrimination in their own departments, are frequently unable to show that the same discriminatory motive is afoot in the institution as a whole. The fact that numerous individual decisions are made by a large number of department heads ... means that there are "individually tailored justifications" for the alleged discrimination in the case of each [employee]. [Citation omitted.]

of a Caucasian male candidate would differ from those necessary to establish that the DHS discriminated against a male of Arab descent in favor of a Caucasian female. Simply stated, the law and the evidence necessary to prove and defend the myriad claims at issue differ significantly, making class treatment unsound.

In support of the typicality requirement, plaintiffs simply asserted that, because the class representatives include ethnically diverse males who work at various DHS offices, "it would be statistically improbable to present a more diverse and representative group of this proposed class than these proposed representatives." However, "the 'mere fact that a complaint alleges racial or ethnic discrimination does not in itself ensure that the party who has brought the lawsuit will be an adequate representative of those who may have been the real victims of that discrimination.' " *Falcon, supra* at 157, quoting *East Texas Motor Freight Sys, Inc v Rodriguez,* 431 US 395, 405-406; 97 S Ct 1891; 52 L Ed 2d 453 (1977). More specifically, that plaintiffs simply share the common characteristics of being male and belonging to a racial or ethnic minority is insufficient to show that the claims of the representative plaintiffs are typical of the class.

As discussed earlier, plaintiffs articulate no factual basis to confirm their individual disparate treatment claims and they fail to connect their allegations to the other members of the class. We further observe that typicality cannot be established when it is foreseeable that a defendant will "raise specific evidence applicable only to each proposed class representative as to why he or she was not promoted or better trained." *Zachery v Texaco Exploration & Production, Inc,* 185 FRD 230, 240 (WD Tex, 1999). Indeed, the claims are not typical where the defendant "might have genuine defenses to

some [p]laintiffs that are not applicable to unnamed class members." *Id.* On this issue, we note that the DHS submitted evidence with its motion for reconsideration that calls into question whether some of the representative plaintiffs were qualified or even eligible for promotion within the DHS during the relevant period. Plaintiffs do not argue that we should ignore the evidence, but characterize it as "simply fodder for cross-examination, discovery and contradiction."

While we decline to assess the substance of the evidence submitted by the DHS with regard to the viability of the representative plaintiffs' disparate treatment claims, plaintiffs' response to the evidence underscores the point articulated above: to defend this action, the DHS will necessarily present evidence for "cross-examination" or "contradiction" with regard to class members' individual allegations that they should have received promotions and did not. That is, to mount a defense to plaintiffs' disparate treatment claims, the DHS must have the opportunity to show the reasons why individual plaintiffs were not or could not be promoted or accepted into the leadership academy. Thus, with regard to the substantive claims and defenses, individualized questions clearly predominate over any questions common to the proposed class and plaintiffs have made no showing that the representative plaintiffs' claims are typical of the class. Such a case is uniquely *not* appropriate for class treatment and the trial court clearly erred by certifying the class.

### D. ADEQUACY

MCR 3.501(A)(1)(d) requires that "the representative parties will fairly and adequately assert and protect the interests of the class[.]"

> The above factor focuses on whether the class represen-
> tatives can fairly and adequately represent the interests of
> the class as a whole. Under *Allen, supra* at 553, this
> involves a two-step inquiry. "First, the court must be
> satisfied that the named plaintiffs' counsel is qualified to
> sufficiently pursue the putative class action. Second, the
> members of the advanced class may not have antagonistic
> or conflicting interests." (Citations omitted.) [*Neal, supra*
> at 22.]

In their motion for class certification, plaintiffs made no
showing that plaintiffs' counsel is qualified to pursue
the class action. The trial court also made no ruling
with regard to the capability of plaintiffs' counsel.
Accordingly, because the record before us is devoid of
information on this issue, we can only conclude that it
was clear error for the trial court to find that plaintiffs
satisfied this factor. The trial court also failed to provide
the required "rigorous analysis" to determine whether
this prerequisite was satisfied.

More importantly, however, the nature of plaintiffs'
claims makes it a virtual certainty that, among the 616
African-American, Arab, Hispanic, and Asian male em-
ployees, including the representative plaintiffs, the in-
terests of individual class members will conflict. On this
adequacy requirement, the trial court opined:

> Speaking to [a]dequacy, the representative parties are
> ethnically and culturally related to the class. Further, the
> issues and promotional allegations regarding state-wide
> departmental deficiencies are asserted by the class. Thus,
> the interests of the class are protected by the representa-
> tive parties.

In essence, the trial court concluded that, because the
representative plaintiffs are minority males and the
claims involve agency-wide allegations, they "will fairly
and adequately assert and protect the interests of the
class[.]" MCR 3.501(A)(1)(d). This reasoning is clearly

erroneous because it ignores the requirements for adequacy of representation and also ignores the various conflicts inherent in plaintiffs' claims. The reasoning in *Neal* is again applicable here:

> Because there are claims that some members were denied promotions, there may be conflicts among the class members related to competitions for the same positions. In addition, because of the highly individualized nature of the claims presented, it is unlikely that the named plaintiffs can adequately represent all the interests of the entire class. [*Neal*, *supra* at 23.]

Here, again, plaintiffs seek as a remedy their appointment to supervisory or managerial positions and compensation for promotions they allegedly should have received in the past. Not only will these determinations require highly individualized proofs, it is exceedingly likely that more than one class member will claim that he is entitled to a particular appointment or that he, rather than a fellow class member, should be compensated for an appointment for which they previously competed. While class members need not suffer identical damages, *A&M Supply*, *supra* at 600, their claims must not diverge, *Neal*, *supra* at 23. Because the very nature of the claims of liability and the remedies sought by plaintiffs raise such potential conflicts, and because plaintiffs have not otherwise demonstrated that the representative plaintiffs can fairly and adequately represent the interests of the class, the trial court clearly erred in granting plaintiffs' motion.

### E. SUPERIORITY

Plaintiffs were also required to demonstrate that "maintenance of the action as a class action will be superior to other available methods of adjudication in promoting the convenient administration of justice."

MCR 3.501(A)(1)(e). This is not the case where, as here, individualized inquiries clearly predominate over any common questions. See *Zine, supra* at 289 n 14. Further, the defenses to disparate treatment claims involving promotional decisions will be specific to each plaintiff, will require individualized proofs relating to hundreds of claims, and will render the action unmanageable as a class action. Moreover, were we to find a generalized claim here, it would be unfair to bind the entire class of plaintiffs to the judgment reached in this case if some minority male employees have viable individual claims of disparate treatment.

### IV. CONCLUSION

Plaintiffs' claims will inevitably involve very fact-specific, individualized assessments of hundreds, if not thousands, of promotional opportunities and decisions that, by definition, implicate numerous applicants, qualifications, positions, locations, and decision makers over many years. The potential proofs mandate individual, not class treatment. The failure of plaintiffs to identify an across-the-board practice or policy that negatively affects male racial and ethnic minorities, for example, in favor of female racial or ethnic minorities, underscores why this case is wholly inappropriate for class action treatment. Indeed, there is no challenged policy or practice that affects all class members that, if discriminatory, and if remedied, could satisfactorily address plaintiffs' generalized complaints. For these and other reasons detailed in this opinion, we hold that the trial court clearly erred by certifying this matter as a class action.

Reversed.